1  **BURSOR & FISHER, P.A.**
   Philip L. Fraietta (State Bar No. 354768)
2  Max S. Roberts (*Pro Hac Vice* forthcoming)
   1330 Avenue of the Americas, 32nd Floor
3  New York, NY 10019
   Telephone: (646) 837-7408
4  Facsimile: (212) 989-9163
   Email: pfraietta@bursor.com
5          mroberts@bursor.com

6  **BURSOR & FISHER, P.A.**
   Joshua R. Wilner (State Bar No. 353949)
7  1990 North California Blvd., 9th Floor
   Walnut Creek, CA 94596
8  Telephone: (925) 300-4455
   Facsimile: (925) 407-2700
9  E-mail: jwilner@bursor.com

10 *Attorneys for Plaintiffs*

11                **UNITED STATES DISTRICT COURT**

12                **NORTHERN DISTRICT OF CALIFORNIA**

13

14

15 | LISA TSERING, ARIEL GILLIGAN, LOGAN MITCHELL, MARC RUSSO, and DILARA USKUP, individually and on behalf of all other persons similarly situated, | Case No.: |

16

17                                          **CLASS ACTION COMPLAINT**

                        Plaintiffs,
18
                                          **JURY TRIAL DEMANDED**
19          v.

20 MAGNITE, INC.,

21                          Defendant.

22

23

24

25

26

27

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**TABLE OF CONTENTS**

PAGE(S)

NATURE OF THE ACTION ...................................................................................1

THE PARTIES ........................................................................................................1

JURISDICTION AND VENUE ..............................................................................2

FACTUAL ALLEGATIONS ...................................................................................3

I.  DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION ECONOMY ...........................................................3

    A.  Data Brokers ...........................................................................3

    B.  Real-Time Bidding ..................................................................7

    C.  Cookie Syncing .....................................................................13

II.  AN OVERVIEW OF DEFENDANT'S ONLINE TRACKING AND ADVERTISING TECHNOLOGY ...........................................16

    A.  Magnite's Rubicon Project Tracker ......................................16

        1.  Interception of Communications ..................................19

        2.  Collection of Persistent Identifiers ...............................20

            a.  Browser Cookies ................................................20

            b.  IP Addresses ......................................................21

            c.  Mobile Advertising Identifiers ..........................24

            d.  Other Identifiers ................................................29

        3.  Identity Resolution .......................................................29

    B.  Magnite Poducts ....................................................................31

    C.  Magnite's Real-Time Bidding ("RTB") Capabilities.............32

III.  DEFENDANT'S TRACKERS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES.........................................................33

    A.  Healthline ..............................................................................33

    B.  Buzzfeed ................................................................................35

    C.  Bon Appetit ...........................................................................39

    D.  Rocket Mortgage ...................................................................42

    E.  Zillow ....................................................................................44

IV.  DEFENDANT'S SERVICES DEANONYMIZE USERS AND ENRICH DEFENDANT AND THE WEBSITE OPERATORS THROUGH REAL-TIME BIDDING AND PROFILING INDIVIDUALS .....................................................................46

    A.  Defendant Combines The Data From The Subject Websites With Other Data To Deanonymize Users.....................................46

    B.  The Partner Pixels Use The Profiles Created By Defendant To Enhance Their Advertising And Analytics Services.............47

V.  PLAINTIFFS' EXPERIENCES ...............................................48

|  | A. | Plaintiff Lisa Tsering ................................................................48 |
|  | B. | Plaintiff Ariel Gilligan ............................................................49 |
|  | C. | Plaintiff Logan Mitchell .........................................................51 |
|  | D. | Plaintiff Marc Russo ...............................................................52 |
|  | E. | Plaintiff Dilara Uskup ............................................................53 |

CLASS ALLEGATIONS .........................................................................................55

CAUSES OF ACTION ............................................................................................57

COUNT I ..................................................................................................................57

    COUNT II ...........................................................................................................58

    COUNT III .........................................................................................................62

    COUNT IV .........................................................................................................64

    COUNT V ...........................................................................................................65

PRAYER FOR RELIEF ..........................................................................................68

JURY TRIAL DEMANDED ...................................................................................68

Plaintiffs Lisa Tsering, Ariel Gilligan, Logan Mitchell, Marc Russo, and Dilara Uskup ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Magnite, Inc. ("Magnite" or "Defendant"), formerly The Rubicon Project, Inc. Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This class action lawsuit sets forth how the business practices of Magnite amount to a deliberate surveillance of millions of Americans via their activity on the Internet and mobile applications. Magnite through its advertising and analytics products, tracks in real time and records indefinitely the personal information and specific web activity of hundreds of millions of Americans.

2.      This unlawfully collected information is worth billions of dollars to Defendant because it makes up the content of Magnite's extensive line of products, and creates individual sales of advertisements in the real-time-bidding ecosystem present on thousands of major websites.

3.      Plaintiffs bring this action to enforce their constitutional rights to privacy and to seek damages under California law for the harm caused by the collection and sale of their confidential data and personal information.

## THE PARTIES

*Plaintiffs*

4.      ***Plaintiff Lisa Tsering.*** Plaintiff Lisa Tsering is a natural person and citizen, residing in El Cerrito, California. Plaintiff Tsering was in California when she accessed the Healthline website and had her activity on that website and subsequent activity on other websites tracked by Defendant.

5.      ***Plaintiff Ariel Gilligan.*** Plaintiff Ariel Gilligan is a natural person and citizen, residing in Long Beach, California. Plaintiff Gilligan was in California when she accessed the Buzzfeed website and had her activity on that website and subsequent activity on other websites tracked by Defendant.

6.      ***Plaintiff Logan Mitchell.*** Plaintiff Logan Mitchell is a natural person and citizen of California, residing in San Diego, California. Plaintiff Mitchell was in California when she accessed

the Bon Appetit website and had her activity on that website and subsequent activity on other websites tracked by Defendant.

7.    **Plaintiff Marc Russo.**    Plaintiff Marc Russo is a natural person and citizen of California, residing in San Diego, California.  Plaintiff Russo was in California when he accessed the Rocket Mortgage

8.    **Plaintiff Dilara Uskup.**  Plaintiff Dilara Uskup is a natural person and citizen of California, residing in Los Angeles, California.  Plaintiff Uskup was in California when she accessed the Zillow website and had her activity on that website and subsequent activity on other websites tracked by Defendant.

**Defendant**

9.    Defendant Magnite, Inc. is a Delaware corporation with its principal place of business in New York.  In April 2020, Magnite was formed after the merger of Rubicon Project, Inc. and Telaria "to better connect publishers with thousands of buyers and brands"[1] and "maximize the value of their data assets."[2]  Magnite claims to be the "world's largest independent omni-channel sell-side advertising company."[3]

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

11.    This Court has personal jurisdiction over Defendant because Defendant collected the private information of thousands or millions of people in California, sold that information to

---

[1] *Meet Magnite, the Largest Independent Omnichannel Sell-Side Platform in the World,* BUSINESSWIRE, (Jun. 30, 2020), https://www.businesswire.com/news/home/20200630005319/en/Meet-Magnite-the-Largest-Independent-Omnichannel-Sell-Side-Platform-in-the-World.

[2] *Introducing Magnite Access: An Omnichannel Audience, Data and Identity Suite*, MAGNITE, (June 15, 2023), https://www.magnite.com/press/introducing-magnite-access-an-omnichannel-audience-data-and-identity-suite/.

[3] MAGNITE, INC., FORM 10-K, (2023), https://www.annualreports.com/HostedData/AnnualReports/PDF/NASDAQ_MGNI_2023.pdf.

---

advertisers in California—who targeted advertisements to Californians based in part on their location in California—and profited from the sale of Californians' personal information. Further, Plaintiff Mitchell resides in this District.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

## I.    DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION ECONOMY

13.    To put the invasiveness of Defendant's privacy violations into perspective, it is important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

14.    As preliminary matters, Magnite is a registered data broker[4] in California and operates as a Sell-Side Platform (SSP)[5] and an ad exchange, as explained in further detail *infra*.

### A.    Data Brokers

15.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[6] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

16.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[7] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data." And whereas individual data sources "may provide only a few elements about

---

[4] Data Broker Registration for Magnite Inc., OAG, https://oag.ca.gov/data-broker/registration/568127.

[5] *Top SSP Platforms To Watch For in 2024*, SMARTYADS, https://smartyads.com/blog/top-ssp-platforms (describing Magnite as one of the "top 10 SSP platforms").

[6] Justin Sherman, *Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy*, DUKE SANFORD CYBER POLICY PROGRAM, at 2 (2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf.

[7] *Id.*

---

a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[8]

17.    For instance, as a report by NATO found, data brokers, like Defendant, collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited.[9]  Inferred data "is gleaned from observed data by modelling or profiling," meaning what consumers may be *expected* to do.[10]  On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[11]

18.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[12]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[13]

19.    This data collection has grave implications for Americans' right to privacy.  For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[14]

20.    As another example:

---

[8] Tehila Minkus et al., *The City Privacy Attack: Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM CONFERENCE ON ONLINE SOCIAL NETWORKS, at 71, (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[9] Henrik Twetman & Gundars Bergmanis-Korats, *Data Brokers and Security*, at 11, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[10] *Id.*

[11] *Id.*

[12] Sherman, *supra* note 6, at 1.

[13] *Id.*

[14] *Id.* at 9.

1
2
3
4
5
6

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

7
8
9
10
11

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

12

> …

13
14

> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[15]

15   21.   Similarly, as the report from NATO noted, corporate data brokers cause numerous

16   privacy harms, including but not limited to depriving consumers of the right to control who does and

17   does not acquire their personal information, unwanted advertisements that can even go as far as

18   manipulating viewpoints, and spam and phishing attacks.[16]

19
20
21
22
23
24
25
26

27   [15] *Id.*

28   [16] Twetman & Bergmanis-Korats, *supra* note 9, at 8.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                          5



22.    Data brokers, like Defendant, are able to compile such wide swaths of information in part by collecting users' IP addresses and other device information, which is used by data brokers like Defendant to track users across the Internet.[17]  Indeed, as McAfee (a data security company) notes, "data brokers … can even place trackers or cookies on your browsers … [that] track your IP

---

[17] *Id*. at 11.

address and browsing history, which third parties can exploit."[18]

23.     These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you.  They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single."  Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[19]

24.     In short, data brokers like Defendant track consumers across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

**B.      Real-Time Bidding**

25.     So, once data brokers, like Defendant, collect information from consumers and create comprehensive user profiles, how does Defendant "sell" or otherwise monetize that information?  This is where real-time bidding comes in, and Defendant, as an ad exchange, facilitates it.

26.     "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[20]

27.     "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)."[21]  An SSP "work[s] with website or app publishers to help them participate in the RTB process."[22]  "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they

---

[18] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE, (Jan. 28, 2025), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[19] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS, (May 10, 2022), https://usefathom.com/blog/data-brokers.

[20] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER, (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[21] *Id.*

[22] *Id.*

put forth."[23]  And an Advertising Exchange like Defendant "allow[s] advertisers and publishers to buy and sell ad inventory directly through real time bidding, and without the need to have an intermediary involved in the transaction.  This model offers several benefits for advertisers and publishers including transparency, flexibility, and a greater degree of control over their inventory."[24]

28.    In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.  Defendant plays crucial roles in this process as a data broker, an SSP, and an Advertising Exchange.

29.    The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost.  But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process.  This information can be added to

---

[23] *Id.*

[24] Brock Munro, *What is an Ad Exchange and How Does It Work*, PUBLIFT, (Feb. 28, 2025), https://www.publift.com/blog/what-is-an-ad-exchange.

existing dossiers DSPs have on a user.[25]



30.     Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about consumers to procure the greatest interest from advertisers and obtain the highest bids for websites and app operators' users.  But these SSPs and DSPs receive assistance by connecting with Data Management Platforms ("DMPs") or data brokers like Defendant:

> the economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road.  The DSP enlists a final actor, the data management platform (DMP) [here, Defendant].  DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers.  The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[26]

---

[25] Geoghegan, *supra*; *see also Real-Time Bidding*, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

[26] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

31.     In other words, before bidding to show a user an advertisement, a DSP will attempt to determine what other information about a user may be available.  A DSP does this by connecting with entities like Defendant, who match a consumer's information from a particular website or mobile application (*e.g.*, their IP address) with any profiles on those users Defendant may have compiled.  If there is a match, then advertisers will pay more money to show users an advertisement because the advertisers have more information to base their targeting on.  This naturally enriches website and app operators, as their users are now more valuable.  And, a DSP is able to continue linking users on a website or mobile application through the Advertising Exchange, which enhances the DSP's ability to better identify users in the future and helps the DSP profit further as well.

32.     As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

(a)     "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, website and app operators] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

(b)     "send[ing] sensitive data across geographic borders."

(c)     sending consumer data "***to potentially dozens of bidders simultaneously***, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad.  Experts have previously cautioned that there are few (if

any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[27]

33.    The last point bears additional emphasis, as it means the data Defendant provides to DSPs to serve targeted advertisements is even provided to those entities who do not actually serve an advertisement on a consumer. This greatly diminishes the ability of users to control their personal information.

34.    Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[28]

35.    For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[29]:



36.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one statutes like the CIPA

---

[27] Office of Technology & Division of Privacy and Identity Protection, *Unpacking Real Time Bidding through FTC's case on Mobilewalla*, FEDERAL TRADE COMMISSION, (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[28] Geoghegan, *supra*.

[29] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

were enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

37.    To summarize the preceding allegations, website and mobile application operators monetize their platforms through the user of real-time bidding.  Through this process, consumer information is provided to advertisers who are interested in showing advertisements to particular consumers.  Advertisers then "bid" to show consumers an advertisement, with the winning bidder ultimately having their advertisement displayed to consumers.  However, all interested advertisers receive consumers' information regardless.

38.    The value of those users is enriched by partnering with data brokers, data management platforms, and advertising exchanges, like Defendant, which enable those entities involved in RTB to link the information said entities collect from consumers on a particular website or app with Defendant's vast repository of information and user profiles that Defendant maintains on billions of consumers.  This enriches the value of a website or app's user base because advertisers have a wider swath of information to use to target relevant consumers, meaning advertisers will pay more money to show users an advertisement on that website or application.

39.    Defendant also operates as the advertising exchange or SSP on thousands of websites, sharing the information collected on millions of Americans with advertisers, SSPs, and DSPs to facilitate hyper-targeted advertising to individuals.

40.    Defendant benefits from this arrangement because websites and apps will want to employ Defendant's services to bring in more advertising revenue, meaning Defendant can continue to expand and grow the information it has about any consumers and add to consumers' profiles, which further perpetuates the value of Defendant's services.

41.    Defendant is already one of the largest players in this industry.  Defendant achieved this status through the use of a variety of technologies and services, as described below.

**C.    Cookie Syncing**

42.    It should now be clear both the capabilities of data brokers like Defendant who de-anonymize users, and the reasons that Defendant's technology is installed on websites (to provide more information to advertisers in real-time bidding.  The final question is how does Defendant share information with other services to offer the most complete user profiles up for sale?  This occurs through "cookie syncing."

43.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[30] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other['s] cookies, in order to better facilitate targeting and real-time bidding."[31]

44.    Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future.  Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com.  Thus, advertiser.com does not (and cannot) know which users visit website3.com.  However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

> …

> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled

---

[30] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[31] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

---

advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[32]



45.     Through this process, third party trackers like Defendant's are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[33]

46.     On the flip side, "CSync may re-identify web users even after they delete their cookies."[34] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[35] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync,

---

[32] Papadopoulos, *supra*, at 1433.

[33] Papadopoulos, *supra*, at 1434.

[34] *Id.*

[35] *See id.*

all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[36]

47.    Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[37]

48.    Cookie syncing is precisely what is happening here.  When Defendant's Pixels are installed on users' browsers, they are syncing their unique user identifiers with other third parties on the websites (*e.g.*, the Partner Pixels listed below).  The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile).  This prevents users from being anonymous when they visit websites.

\*        \*        \*

49.    To summarize the proceeding allegations, Defendant is a data broker that focuses on collecting as much information about users as possible to create comprehensive user profiles. Through "cookie syncing," those profiles are shared by Defendant with other entities (and vice versa) to form the most fulsome picture with the most attributes as possible.  And those profiles are offered up for sale to interest advertisers through real-time bidding, where users will command more value the more advertisers know about a user.  Thus, Defendant enriches the value that website users would otherwise command by tying the data they obtain directly from users on websites with comprehensive user profiles in their possession or in the possession of other entities they sync with.

50.    Accordingly, Defendant is using the Pixels in conjunction with website operators and other third parties to (i) de-anonymize users, (ii) offer users up for sale in real-time bidding, and (iii) allow website operators to monetize websites by installing Defendant's Pixels and allowing the Defendant to collect as much information about users as possible (without consent).

51.    Of course, Defendant also benefits from this arrangement because websites and apps will want to employ Defendant's services to bring in more advertising revenue, meaning Defendant

---

[36] *Id.*

[37] *Id.* at 1441.

1    can continue to expand and grow the information they have about any consumers and add to

2    consumers' profiles, which further perpetuates the value of Defendant's services.

3        52.    As it stands though, Defendant is already one of the largest players in this industry.

4    Defendant achieved this status using a variety of technologies and services, as described below.

5    ## II.    AN OVERVIEW OF DEFENDANT'S ONLINE TRACKING AND ADVERTISING TECHNOLOGY

6

7        53.    Magnite's business as a software-as-a-service company "depends on [their] ability to

8    collect, use, and disclose data to deliver advertisements."[38]  It is critical to the "value of [their]

9    services," that Magnite "collect, use, and share data about … user behavior and interaction with

10    content."[39]  To do so, Magnite oversees a massive web of online tracking technologies, including its

11    Rubicon Tracker, that reads and intercepts communications to provide ongoing information to

12    Magnite and advertisers that Magnite contracts with that have their own pixels ("Partner Pixels"),

13    which are integrated into the design of websites.

14        ### A.    Magnite's Rubicon Project Tracker

15        54.    Magnite developed the Rubicon Tracker, which it provides to website owners for a

16    fee.

17        55.    "Publishers use [Magnite's] technology to monetize their content [and] [t]he world's

18    leading agencies and brands trust [Magnite's] platform to access … billions of advertising

19    transactions each month."[40]

20        56.    In other words, Magnite enables companies to sell advertising space on their websites,

21    thereby earning revenue, and allows companies to place advertisements on other companies'

22    websites, thereby driving brand awareness and sales.  To achieve this, Magnite uses its Rubicon

---

[38] MAGNITE INC., FORM 10-K, (2023), https://www.annualreports.com/HostedData/AnnualReports/PDF/NASDAQ_MGNI_2023.pdf at 24.

[39] *Id.*

[40] *iHeartMedia and Magnite Unify Access to Broadcast and Digital Audio, Providing Advertisers with a Direct Path to Premium Inventory*, MAGNITE, (Jan. 9, 2024), https://investor.magnite.com/news-releases/news-release-details/iheartmedia-and-magnite-unify-access-broadcast-and-digital-audio.

Tracker to receive, store, and analyze information collected from website visitors, such as visitors of the websites, which Plaintiffs used.

57.    Similar to above, the first time Plaintiffs visited the websites, their browser sent an HTTP request to each website's server, and that server sent an HTTP response with directions to install the Rubicon Tracker on the user's browser.  The Rubicon Tracker, in turn, instructs the user's browser to send Magnite the user's IP address.

58.    Moreover, Magnite stores a cookie with the user's IP address in the user's browser cache.  When the user subsequently visits the website, the Rubicon Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the Rubicon Tracker causes the browser to send the cookie along with the user's IP address to Magnite.  A general diagram of this process is pictured below, which explains how each website causes the Rubicon Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address through the cookie.



59.    If the user clears his or her cookies, then the user wipes out the Rubicon Tracker from its cache.  Accordingly, the next time the user visits the website the process begins over again: (i) the website's server installs the Rubicon Tracker on the user's browser, (ii) the Rubicon Tracker instructs the browser to send Magnite the user's IP address, (iii) the Rubicon Tracker stores a cookie in the browser cache, and (iv) Magnite will continue to receive the user's IP address on subsequent visits to the website as part of the cookie transmission.

60.    In all cases, however, Magnite receives a user's Device Metadata (the "ua" string in the image below) and unique user ID each and every time its Tracker is loaded by the Websites.

61.    The Rubicon Tracker will also call other third parties to the Websites and share the user's cookie value with these other third parties.  The explicit purpose of this cookie syncing is to identify the user by matching that user with any profiles Magnite and/or these other third parties may have on the user, which are then provided by Magnite for sale to advertisers.

62.    It is estimated that Magnite collects information on a billion website interactions. "By leveraging [their] platform, [Magnite] believe[s] buyers can reach approximately one billion internet users globally, including through many of the world's largest and most premium sellers."

63.    The collection of this highly detailed information relies on a series of "pixels" loaded onto websites.

64.    A pixel is a piece of code that website operators can integrate into their websites that are "designed to be transparent, or camouflaged in the background color of the website so that they don't stand out to users" as they track users of a webpage and the types of actions they take there.

65.    Magnite collects information on Internet users' activity on a wide variety of websites using its pixel, the Rubicon Tracker.

66.    Defendant collects information on Internet users' activity on a wide variety of websites through the use of its Tracker, proprietary software or code it owns and develops and through partnering with other data brokers and advertisers.

67.    The advertisers that Magnite contracts with have their own pixels ("Partner Pixels"), which are integrated into the design of websites.  To facilitate the identity resolution and real time bidding processes, described below, these pixels interact with and receive information from, the Rubicon Tracker when both the Partner Pixel and Rubicon Tracker are loaded onto a particular website.

68.    Plaintiffs' testing revealed that the Rubicon Tracker interacts with, at a minimum, dozens of Partner Pixels on websites across the internet.

69.    All of the above information is used to identify individuals and track their activity, but wiretapping communications and collection of persistent identifiers play particular roles in the Magnite surveillance apparatus.

*1. Interception of Communications*

70.    When an individual visits a website, they communicate a wide variety of information to that website.  This can be as simple as their selection of an article or video the individual would like to view, but can also include highly personal information such as health status and treatment, travel plans, political affiliation, sexual orientation, and many, many more.

71.    When the Rubicon Tracker is loaded on to a website, Defendant surreptitiously intercepts these communications. The primary way this is accomplished is through the collection of the universal resource locator ("URL") for each page of each website visited by an individual.

72.    Sometimes known as a "web address," the URL is the name of the webpage as displayed in the address bar of a browser.

73.    Each page on a website has its own individual URL, allowing pixels with access to the URL to see which pages of a website a particular Internet user visited.

74.    All URLs identify the pages of each page of a website an internet user visited, but some—depending on the design of the website—also disclose the contents of information entered onto a webpage.  These URLs are known as full-string descriptive URLs.

75.    For example, when a user enters information into the Zillow website indicating the property they are interested in renting, touring, or purchasing, that information is included in the URL of the webpage and is collected by the Rubicon Tracker.



76.     The Rubicon Tracker collects the URL values of the pages visited by millions of internet users and, thus, intercept communications between the individuals and those websites, including sensitive information like travel information and health information.

77.     As such, any pixel that intercepts the URL on this page also intercepts the content of the users' communications with Zillow about their real estate plans.  This process works similarly on other websites.

78.     The Rubicon Tracker collects both types of URLs and any information that can be gleaned or inferred from those URLs is added to the profiles that Defendant has for that particular user.

79.     The Rubicon Tracker is configured to intercept confidential communications between internet users and websites. The intercepted information is then added to Defendant's consumer profiles and shared with bidders and advertisers as part of the real-time bidding process on thousands of websites.

### 2.  Collection of Persistent Identifiers

80.     One way Magnite tracks individuals across multiple websites is through the use of persistent identifiers.  As the name suggests, persistent identifiers are identifying information that follows an Internet user from one website or app to another.  Magnite uses these identifiers to confirm that using a particular website is the same person identified by Magnite on another website.

### a.     Browser Cookies

81.     One form of persistent identifier is a browser "cookie." Cookies are "small pieces of data" that are sent to and from your browser that "are used to identify specific users" as you use a website.[41]

82.     When a Rubicon pixel is called onto a website, it automatically downloads a cookie onto the browser of the person visiting the website.  Magnite then links a proprietary ID number to the cookie and the individual with the cookie.

---

[41] *See, e.g.*, *What are Cookies?*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/cookies?srsltid=AfmBOoruAlTpzAwi873DiQP04NfjdG4VJI9wO1jEBbz-LCIy71Sfiflk.

83.    **In other words, Magnite effectively "stamps" each cookie with its own identifier to better enable it to track individuals across the Internet.**

84.    After the cookie is loaded onto a person's browser, each time that person visits a website where a Rubicon pixel is called, Magnite uses the cookie to identify the website visitor as the same person who visited previous websites with the same cookie installed on their browser.  As such, Magnite can track each individual internet user across multiple sites to create a more detailed profile on that person's beliefs, interests, and habits.

85.    This information is cross-referenced with other information collected by Magnite to specifically identify the individual using the device and to add this web-activity information to a larger profile on the individual to sell their profile for targeted advertising.

### b.    IP Addresses

86.    IP addresses are another common persistent identifier.

87.    An IP address is a unique set of numbers assigned to a device on a network, which is typically expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses.  Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[42]

88.    Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for identifying a device on the Internet or within a local network, facilitating smooth communication between devices.

89.    IP addresses are not freely accessible.  If an individual is not actively sending data packets out, their IP address remains private and is not broadcast to the wider internet.

---

[42] *See, e.g.*, *What is the Internet Protocol?* CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; *What is an RFC1918 Address?* NETBEEZ, (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

90.    IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.[43]  Thus, knowing a user's public IP address—and therefore geographical location provides "a surprisingly large amount of information" about a user.[44]

91.    An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[45] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[46]  Indeed, "[c]ompanies can use an IP address as a value to personally identify individuals."[47]

92.    In fact, an IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and server marketing messages to a highly targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[48]  For example, for a job fair in a specific city, companies can send advertisements to only those in the general location of the upcoming event.[49]

---

[43] *IP Location Lookup*, IPLOCATION.IO, https://iplocation.io/.

[44] *What Does an IP Address Tell You About Website Visitors?*, GEOPLUGIN, (Nov. 7. 2024), https://www.geoplugin.com/resources/what-does-an-ip-address-tell-you-about-website-visitors/.

[45] *Location-based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[46] Herbert Williams, *The Benefits of IP Adress Targeting for Local Businesses*, LINKEDIN, (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf#:~:text=First%2C%20it%20allows%20businesses%20to,than%20other%20forms%20of%20advertising.

[47] Trey Titone, *The Future of IP Address As An Advertising Identifier*, AD TECH EXPLAINED, (May 16, 2022), https://www.adtechexplained.com/p/the-future-of-ip-address-as-an-advertising-identifier.

[48] *Geomarketing Strategies & Tips: The Essential Guide*, DEEPSYNC, (Jan. 3, 2025), https://deepsync.com/geomarketing/.

[49] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://www.geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

---

93.     "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address.  IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[50]

94.     "IP targeting capabilities are highly precise, with an accuracy rate of over 95%.  This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[51]

95.     In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising."[52]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[53]

96.     Further, "IP address targeting can help businesses to improve their overall marketing strategy."[54]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[55]

97.     Putting IP addresses in the hands of a data broker like Microsoft is particularly invasive, as the NATO report noted:

> [a] data broker may receive information about a[] [website] user, including his ... IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the

---

[50] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB (last accessed Feb. 12, 2025).

[51] *Id.*

[52] Williams, *supra*.

[53] *Id.*

[54] *Id.*

[55] *Id.*

---

> data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[56]

98.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[57]

### c.    Mobile Advertising Identifiers

99.    Magnite employs similar methods to track individuals using mobile apps on Android and iOS devices.

100.    Magnite owns and operates multiple "software development kits" (SDKs), pieces of code that work independently or with "application programming interfaces" (APIs) and are loaded into mobile apps and can track users' activity on certain apps.[58]

101.    An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[59]

102.    An API "acts an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers [and] business partners."[60]  An API can "work[] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[61]    APIs "enable[] companies to open up their

---

[56] Twetman & Bergmanis-Korats, *supra*.

[57] *Is an IP Address Personal Data?* CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/ (last modified June 22, 2024); *see also Data Protection Explained*, European Commission, https://commission.europa.eu/law/law-topic/data-protection/data-protection-explained_en.

[58] *SDK vs API: What's the Difference?*, IBM, (July 13, 2021), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).  Plaintiffs will refer to both collectively as the "Magnite SDKs" to avoid any confusion.

[59] *API vs. SDK: The Difference Explaining (With Examples)*, STREAM, https://getstream.io/glossary/api-vs-sdk/.

[60] *What is an API?*, IBM, available https://www.ibm.com/topics/api.

[61] *SDK vs. API: What's the Difference?*, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

---

applications' [or websites'] data and functionality to external third-party developers, business partners, and internal departments within their companies."[62]

103.    Like the pixels on web browsers, the Magnite SDKs are called by other SDKs when a user accesses a particular app.

104.    The Magnite SDKs track the types of user information Defendant obtains through the Rubicon Tracker including, but not limited to, users': location information, email addresses, device and advertising identifiers, and usage of the particular app being accessed.

105.    In addition to its own ID tracking, Magnite collects advertising identifiers that are designed to track the app activity of individual users across different apps. Two of the most prominent are AAIDs (for Android devices) and IDFAs (for iOS devices) (collectively, "Mobile Advertising IDs" or "MAIDs").

106.    An AAID is a unique string of numbers which attaches to a device.  As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[63]  So, for example, if a third party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

107.    Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets that identifier.  The fact that the use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendant and others in the field that they are almost never manually reset by users (or else an AAID would be of no use to advertisers).  Byron Tau, MEANS OF CONTROL: HOW THE HIDDEN ALLIANCE OF TECH AND GOVERNMENT IS CREATING A NEW AMERICAN SURVEILLANCE STATE at 175 (2024) ("Like me, most people had no idea about the 'Limit Ad Tracking' menu on their iPhones or the AAID that Google had given even Android devices.  Many still don't."); *see also Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("While AAID are resettable by

---

[62] *Application Programming Interface (API)*, IBM, https://www.ibm.com/cloud/learn/api.

[63] Advertising ID, GOOGLE, https://support.google.com/googleplay/android-developer/answer/6048248 (last visited Dec. 23, 2024).

users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.") (cleaned up).

108.    Using publicly available resources, an AAID can track a user's movements, habits, and activity on mobile applications.[64]  Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[65]

109.    Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences.  These inferences, combined with publicly available tools, make AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

110.    Similarly, an "Identifier for Advertisers, or IDFA for short, is a unique, random identifier (device ID) that Apple assigns to every iOS device. An IDFA would be the equivalent of a web cookie, in the sense that it enables advertisers to monitor users' engagement with their ads and keep track of their post-install activity."[66]

111.    As with the Magnite cookies and AAID, Magnite's collection of IDFAs allows Magnite to track iOS users' activity across the various apps they use.  Like the AAID, this data can create inferences about an individual, such as a person's political or religious affiliations, sexuality, or general reading and viewing preferences.  These inferences, combined with publicly available tools, sufficiently permit even an ordinary person to identify a specific individual with the IDFA.

112.    Regardless of whether these IDs are supposed to be anonymous, MAIDs are often combined with other identifiers to identify users in what is known as ID Bridging.  "ID Bridging" is the process of "piecing together different bits of information about" a user "to confidently infer that

---

[64] Thomas Tamblyn, *You Can Effectively Track Anyone, Anywhere Just By The Adverts They Receive*, HuffPost, https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5.

[65] Willie Boag, *Trend Report: Apps Oversharing Your Advertising ID*, International Digital Accountability Council, https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/.

[66] Glossary, Identifiers for Advertisers (IDFA), AppsFlyer, https://www.appsflyer.com/glossary/idfa/#:~:text=Identifier%20for%20Advertisers%2C%20or%2 0IDFA,of%20their%20post%2Dinstall%20activity.

it is the same individual accessing a publisher's site or sites from various devices or browsers."[67]
That is, users can be identified and tracked by "bridging" (or linking) their MAIDs to other sources,
such as e-mail addresses, geolocation, or phone numbers.



113.    ID Bridging "has long been the foundation of programmatic advertising,"[68] which is
the process by which companies "use [] advertising technology to buy and sell digital ads" by
"serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[69]
It entails a "unique identifier[] assigned to individual devices," including "Google's Advertising ID,"
personal information like geolocation and e-amil address, and "cross-platform linkage."[70]

114.    ID Bridging is a money-making machine for advertisers and app developers.  On the
advertiser side, ID Bridging "increase the chances of an ad buying platform finding their inventory
to be addressable and, therefore, maximizes their 'ad yields.'"  And on the app developer side,

---

[67] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024, https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.

[68] Matt Keiser, *How Can ID Bridging – The Foundation of our Space – Suddenly Be a Bad Thing?*, ADEXCHANGER, https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[69] Programmatic Advertising, AMAZON ADS, https://advertising.amazon.com/blog/programmatic-advertising#.

[70] Anete Jodzevica, *ID Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD, (Nov. 15, 2024), https://setupad.com/blog/id-bridging/.  Ironically, the example given in this article is a "hashed e-mail," where the e-mail Defendant collected in this example is not hashed.

"publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[71]

115.    In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information.  And app users' information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

116.    Many companies (*e.g.*, data brokers, identity graph providers), publicly advertise their ability to conduct such bridging.  And Magnite itself has touted the benefits of ID Bridging, noting that ID bridging has "potential positives" that are "obvious."[72]

117.    Yet, while those within the ID Bridging industry describe it as privacy-protective, it is anything but.  As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them."  *Katz-Lacabe v. Oracle Am., Inc.*, 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

118.    In February 2019, Oracle published a paper entitled "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides as accurate a description of Google's services as Defendant's:

> a consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities. This information is collected through an extensive web of … services, which is difficult, if not impossible to avoid.  It is largely collected invisibly and without consumer consent.  Processed by algorithms and artificial

---

[71] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It To Grow Direct And Programmatic Revenue?*, OPTABLE (Aug. 22, 2024), https://www.optable.co/blog/what-is-id-bridging.

[72] Garrett McGrath, *The Evolving Programmatic Identity Landscape*, MAGNITE, (Mar. 19, 2024) https://www.magnite.com/blog/the-evolving-programmatic-identity-landscape/#:~:text=ID%20Bridging:%20A%20Potential%20Solution&text=With%20these%20important%20caveats%2C%20ID,subject%20to%20%E2%80%9Csurprise%E2%80%9D%20implementations..

intelligence, this data reveals an intimate picture of a specific consumer's movements, socio-economics, demographics, "likes", activities and more.  It may or may not be associated with a specific users' name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[73]

119.    In other words, ID Bridging is dangerous because of the sheer expanse of information being compiled by companies like Defendant without the knowledge or consent of users, all of which is being done for pecuniary gain.

### d.    Other Identifiers

120.    In addition to the methods described above, which are explicitly designed to track individuals across different devices and apps, Magnite collects other identifying information that allows it to determine whether the same individual is visiting multiple websites or using multiple apps where Magnite technology is called to or installed directly.

121.    One method is through collecting e-mail addresses.  The logic of this is straightforward.  If Magnite collects the same e-mail address from two different site visits, it can determine with almost total accuracy that the sites are both being visited by the same person.  The same is true of devices.  If the same e-mail address is captured on two different devices, it is very likely those devices are used by the same individual.

122.    Location information functions in a similar manner.  If multiple websites or apps are visited from the same location, the pool of potential individuals who are accessing the website or app is narrowed considerably immediately and can be narrowed to a pinpoint over time.

123.    HTTP requests, when intercepted by Magnite, collect device information that can also identify whether the same user is visiting multiple sites or apps, and can distinguish between the devices being used by a particular person.  With every visit, and every subsequent HTTP request, the device information will be identical in each.

### 3.    Identity Resolution

---

[73] *Google's Shadow Profile: A Dossier of Consumers Online and Real World Life*, at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

124.    Identity resolution is another way to monetize Defendant's tracking, where it assigns an ID number to an individual so that the individual is attached to a record of their web and app activity for the purpose of targeted advertising.

125.    Once sufficient data has been collected on an individual, Defendant monetizes the individual's data in a number of ways.  One way is to provide individuals' identities and web browsing information to the companies operating the Partner Pixels to assist with those companies' collection of internet users' data.

126.    This process happens when both the Rubicon Tracker and a Partner Pixel are loaded onto a website. The Partner Pixel "calls" the PubMatic Tracker and the PubMatic responds with a request that shares the individual's PubMatic ID and associated information, including the identifiers described above, with that Partner Pixel.

127.    This process happens multiple times on each website, with many tracking pixels and potential advertisers gaining access to an individual's information for bidding and targeted advertising, enriching Defendant, the other technology companies involved, and the host websites alike while trampling consumer privacy in the process.  Transmissions of this type are happening across all of the websites and apps where the Rubicon tracker is loaded.

128.    With respect to the delivery of targeted advertisements on websites, Defendant's ID syncing makes the entire real-time-bidding process possible by identifying the individual visiting the site and providing information about their web activity and interests.  This creates the basis for hyper-targeted advertising related to that activity and those interests to be served. This ultimately benefits the website or app operator, as it makes their userbase more valuable because said users have been further identified and linked to other activity via Defendant's Tracker.

129.    For these processes to happen, Defendant must necessarily share the information it collects on individual internet users with its partners.

130.    The identity resolution service aids in the wiretapping and surveillance conducted by the Pixel Partners.

131.    As part of their investigation, Plaintiffs' counsel conducted testing on several websites to provide a sample of the widespread tracking and wiretapping of, and targeted

advertising to, millions of Americans by Magnite.  For each of the websites tested, there are hundreds or thousands of others where the same or similar information is collected.  *See* Factual Allegations § III, *infra*.

132.    Specifically, Plaintiffs' counsel found that each website and/or app had Partner Pixels loaded onto it, which in turn communicated with the Rubicon Tracker to better enable their advertising.  Each Partner Pixel would itself intercept users' communications with the website or app.  The Rubicon Tracker would then assign a unique ID to the user's activity on the website or app, which, among other things, (i) allowed for the user to be identified; (ii) link the user to information from across other websites and apps; and (iii) benefit the websites, apps, and Partner Pixels by making that user more valuable to advertisers because the user could be better targeted with relevant ads due to the extensive information Defendant collected and provided to the Partner Pixels.

**B.    Magnite Poducts**

133.    In addition to the Rubicon tracker, Magnite offers other products and services to its clients to facilitate the advertising process.

134.    Magnite calls its suite of data products the Magnite Access Suite.[74]  It includes four products: Magnite DMP; Magnite Storefront; Magnite Match; and Magnite Audiences.[75]

135.    Magnite DMP helps publishers sell their first-party data.  It "enables sellers to seamlessly create, [audience] segment[s]" so they can make their data more valuable to buyers.[76]

136.    Magnite Storefront "enables the activation of buyer and seller first-party data on the sell side and facilitates the buying and selling of third-party data–from discovery to activation–across all of Magnite's platforms."[77]

---

[74] *Introducing Magnite Access: An Omnichannel Audience, Data and Identity Suite*, MAGNITE, https://www.magnite.com/press/introducing-magnite-access-an-omnichannel-audience-data-and-identity-suite/.

[75] *Id*.

[76] *Id*.

[77] *Id*.

137.    Magnite Match is "a cloud-based solution that allows sellers and buyers to establish a match between data sets" so that a publisher's first-party data can be merged and enhanced with other data about the same individual.[78]

138.    Magnite Audiences are "cross-publisher segments that Magnite packages to make it easier and more efficient for buyers to reach high value audiences at scale."[79]   In other words, Magnite takes a publisher's first-party data and combines it with first-party data from other publishers where the individuals have similar interests based on their web activity, which "generates a potential new revenue stream for publishers with no additional operational overhead."[80]

139.    In sum, the sale of user data through this suite of products is the culmination of Magnite's tracking, where the data is sold for the purpose of targeted advertising.

140.    In sum, Defendant's suite of products relies on the collection of mass amounts of data on each individual, collected both from the Rubicon pixels and other sources, including Partner Pixels and other data brokers and allows for that data to be instantly sold in a large variety of ways with entities involved in the real-time bidding and advertising delivery.  This is the core of the privacy violations alleged herein: not only are individuals tracked everywhere they go online, but the data collected is sold to dozens or hundreds of other parties without their consent.

**C.**    **Magnite's Real-Time Bidding ("RTB") Capabilities**

141.    In 2010, Magnite "added RTB capabilities, creating a real-time open-market auction allowing all buyers accessing [their] platform to compete to purchase all of the advertising inventory that sellers made available to [Magnite's] platform."[81]

142.    Magnite describes its RTB services like this: every time "a user visits a website or uses an application where [Magnite's] auctions technology is integrated," a unique "individual

---

[78] *Id*.

[79] *Id*.

[80] *Id*.

[81] THE RUBICON PROJECT, INC. FORM 10-K, (2018), https://investor.magnite.com/static-files/6cd3d8ac-b1b7-4513-93c5-c3f14d0ca1fd at 5.

advertising impression [is] created."[82]  Immediately thereafter, Magnite's RTB "technology must send bid requests to appropriate buyers, receive and process their responses, [and] select a winner, [all] within milliseconds."[83]  *See also* Factual Allegations, § I.B, *infra.*  In 2016, Magnite introduced its header bidding[84] solution which enhances RTB.[85]  Magnite enables companies to target specific people through their Custom Auction Packages, which "[l]everage behavior and context by bringing [] first and third-party data, or by using open-market seller data to build [data sets]" identifying targets.[86]  Magnite makes its money by the fees it charges buyers and sellers to use its platform and suite of products and packages.[87]

## III.    DEFENDANT'S TRACKERS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES

### A.    Healthline

143.    Healthline is a website featuring articles related to health, diseases, and medical care.

144.    Unbeknownst to website visitors, the Rubicon Tracker is loaded onto each page of

> **https://fastlane.rubiconproject.com/a/api/fastlane.json?**
> **Fri Jan 31 15:39:16 EST 2025**

the Healthline website.

---

[82] MAGNITE, INC., FORM 10-K, *supra* note 31, at 19.

[83] *Id.*

[84] Header bidding is a "process that enables publishers [or sellers] to simultaneously collect multiple bids from a number of demand sources (not only from their ad server) on all of their ad inventory prior to a sale."  *See* https://clearcode.cc/blog/what-is-header-bidding/.

[85] THE RUBICON PROJECT, INC. FORM 10-K, *supra.*

[86] *Buyers*, MAGNITE, https://www.magnite.com/buyers/.

[87] MAGNITE INC., FORM 10-K, *supra*, at 10, 20.

145.    As soon as the individual reaches the Healthline website, the Rubicon Tracker installs tracking cookies on the individual's browser as described herein.

khaos  M477FU9H-X-BFUR
audit
1|RM5S3etGyg7fcWcFlCl++31NbmCQ9Ch7SvjvQDQJWDCz9Ymwjnheir++kdZEBUKs8woUygBUSTxw0

sec-ch-ua: "Not A(Brand";v="8", "Chromium";v="132", "Google Chrome";v="132"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
sec-fetch-dest: image
sec-fetch-mode: no-cors
sec-fetch-site: cross-site
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko)
Chrome/132.0.0.0 Safari/537.36

146.    The Rubicon Tracker also collects the individual's browser and device information as described above.

147.    The Rubicon Tracker also intercepts the detailed, full-string URL from each page of the Healthline website a user visits, thereby intercepting the user's communications with the website regarding which articles they want to view.

rf       https://www.healthline.com/health/depression/selective-serotonin-reuptake-inhibitors-ssris
kw      treatmentseekers,serotonin,asthma-aq-t1,breast_cancer-aq-t1
tg_i.domain    healthline.com
tg_i.page      https://www.healthline.com/health/depression/selective-serotonin-reuptake-inhibitors-ssris
tg_i.ref https://www.healthline.com/health/depression/selective-serotonin-reuptake-inhibitors-ssris
tg_i.k1 depression
tg_i.k2 mentalhealth
tg_i.url https://www.healthline.com/health/depression/selective-serotonin-reuptake-inhibitors-ssris

148.    As shown in the image above, not only does Defendant receive the URL of each article selected and viewed, it also receives pre-selected audience segments (in this case, "depression" and "mental health") to more easily categorize the individual website user for the purpose of targeted advertising.

149.     The Rubicon Pixel is ID syncing with and providing identity resolution to multiple Partner Pixels on the Healthline website.

```
GET
/profiles_engine/ProfilesEngineServlet?at=20&dpi=219111726&mi=10&csh=1980923529%3B1723987475
&rnd=-1889590490&pcid=f64af2d0-0bf1-0556-1ad7-f859df7db36c h3
:authority: sync.intentiq.com
:method: GET
```

150.     Defendant adds the information it intercepts and receives from the Partner Pixels to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to real estate and specific to the geolocations searched to the individual—and enriches Zillow—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

151.     Defendant, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**B.      Buzzfeed**

152.     Buzzfeed is a popular entertainment and culture website, featuring a variety of articles and quizzes related to popular culture.

153.     Unbeknownst to website visitors, at least 14 Rubicon Tracker pixels are loaded onto the Buzzfeed website.

```
Endpoints
https://micro.rubiconproject.com
https://ads.rubiconproject.com
https://prebid-server.rubiconproject.com
https://fastlane.rubiconproject.com
https://beacon-iad2.rubiconproject.com
https://prebid-a.rubiconproject.com
https://eus.rubiconproject.com
https://token.rubiconproject.com
https://pixel.rubiconproject.com
https://secure-assets.rubiconproject.com
https://s.update.rubiconproject.com
https://pixel-us-east.rubiconproject.com
https://beacon-nf.rubiconproject.com
https://rubicon-match.dotomi.com
```

154.    As soon as the individual reaches the Buzzfeed website, the Rubicon Trackers install tracking cookies onto the individual's browser in the manner described herein.

155.    The Rubicon Tracker also collects the individual's browser and device information as described herein.

156.    Defendant also services real-time bidding for advertisements on the Buzzfeed website. To do this, Defendant identifies the user as described above and collects the detailed, descriptive URL for the page visited by the user as the user clicks on a particular link or article (i.e. in real time).

rf        https://www.buzzfeed.com/kristatorres/douchebag-reddit

157.    Defendant both operates an advertising auction and acts as a bidder in that auction on the Buzzfeed website. Plaintiffs' testing shows Defendant accepting bids for a banner ad on the Buzzfeed website.

```
"serverTimeoutMillis": 425,
"adUnits": [{
        "adUnitCode": "div-gpt-ad-238",
        "transactionId": "f2d63f4d-3b8c-476b-bbb0-24583349bac8",
        "mediaTypes": ["banner"],
        "dimensions": [{
                "width": 300,
                "height": 250
```

158.    For this single advertisement, Defendant solicited bids from 15 Partner Pixels, all of whom are data brokers who collect information on internet users, and bid on the ad space itself.

"bidderOrder": ["appnexus", "ix", "yahoossp", "grid", "sharethrough", "rubicon", "openx", "ozone", "triplelift", "pubmatic", "criteo", "trustx", "teads", "rise", "kargo", "33across"].

159.    In order for each of these Partners to make a determination as to how much they should bid to advertise to the particular website user, Defendant shares the information it has collected on the individual with each of these Partner Pixels.

160.    Plaintiffs' testing shows the auction occurring, with certain Partners losing bids. Below, the Yahoo SSP attempts to bid on behalf of goodfoods.com, but the bid is rejected.

"bidder": "yahoossp",
"bidId": "5d842cdd-d91e-4d9e-a3a4-444a3cfbfb75",
"source": "server",
"status": "rejected-ipf",
"clientLatencyMillis": 642,
"httpLatencyMillis": 624,
"bidResponse": {
        "bidPriceUSD": 0.0031161937550823146,
        "mediaType": "banner",
        "dimensions": {
                "width": 300,
                "height": 250
        },
        "floorValue": 0.01,
        "floorRuleValue": 0.01,
        "adomains": ["goodfoods.com"],
        "rejectionReason": "Bid does not meet price floor"

161.    Defendant wins its own auction, servicing an ad for Target on the website.

```
"bidder": "rubicon",
"bidId": "9811db5ed5ab8d48",
"source": "client",
"status": "success",
"clientLatencyMillis": 752,
"httpLatencyMillis": 744,
"bidResponse": {
        "bidPriceUSD": 2.91,
        "dealId": 853324,
        "mediaType": "banner",
        "dimensions": {
                "width": 300,
                "height": 250
        },
        "floorValue": 0.01,
        "floorRuleValue": 0.01,
        "adomains": ["target.com"],
        "networkId": "2307"
```



162.    Defendant also collects audience assumptions about the page the user visits, including that the user visited a page with "negative" sentiment and potential topics of interest.

```
"urlslug": "douchebag,reddit",
"qt_loaded": true,
"w_category":
"technology_computing,music_and_audio,science,family_and_relationships,pop_culture,computing,childre
ns_music,adult_contemporary_music,physics,chemistry,divorce,single_life,dating,internet,social_networki
ng",
"w_sentiment": "negative",
"w_keyword": "surefire_way,people"
```

163.    Defendant then adds this information to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and information viewed—and enriches Buzzfeed—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

164.    Defendant also, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

### C.    Bon Appetit

165.    Bon Appetit is a website operated by Conde Nast food and entertaining magazine that provides, among other things, recipes; articles related to cooking tips and techniques; as well as recommendations and reviews of restaurants and cooking products.

166.    The website also contains ad space where companies, like Defendant, act as an advertising exchange and facilitate the real-time bidding process to hyper-target advertisements to individual website users based on data collected about their browsing activity and other activity.

167.    Unbeknownst to website visitors, the Rubicon Tracker is loaded onto each page of the Bon Appetit website.

```
:authority: fastlane.rubiconproject.com
:method: GET
```

168.    Within seconds of the user reaching the Bon Appetit website, the Rubicon Tracker takes over 75 actions, including intercepting communications, ID syncing with Partner Pixels, and various other tracking activities.

169.    The Rubicon Tracker also immediately loads tracking cookies onto the individual's browser in the manner described herein.

1

Cookie: khaos=M4DB08VH-1X-G6WU; khaos_p=M4DB08VH-1X-G6WU; receive-cookie-deprecation=1;
audit_p=1|ZTZZ1TAlP2zeukCZYlkv8UurX1CGn8xXsR/Mnov64zH+KY6hhSJXGicnahluUy1wmEBV3DFcR
rMwHTRO1/p4iHX0qfg68IpFQAPcN3ARK85saOwd+PKfwVEEyFaHudv/fii5JgxlpoHDI4Z0lBtQwUaUnaujS
q3PDg47GSyUA+zREvsM2ra73MRmS8gGs6ylTIon0IrnE1p4+byUJuUHKNI4Am3SUH3rwETMVR8lnVPic
tVKl3nW/ZSmfFa9k+2RfCCm1vF3Tgn8ih/oL8+08tuVaVkDFDbShAUs62yL6R/NrqyJFfh/0UyOkB3RL+NS
X1vKT1ONdRY=;
audit=1|ZTZZ1TAlP2zeukCZYlkv8UurX1CGn8xXsR/Mnov64zH+KY6hhSJXGicnahluUy1wmEBV3DFcRr
MwHTRO1/p4iHX0qfg68IpFQAPcN3ARK85saOwd+PKfwVEEyFaHudv/fii5JgxlpoHDI4Z0lBtQwUaUnaujS
q3PDg47GSyUA+zREvsM2ra73MRmS8gGs6ylTIon0IrnE1p4+byUJuUHKNI4Am3SUH3rwETMVR8lnVPic
tVKl3nW/ZSmfFa9k+2RfCCm1vF3Tgn8ih/oL8+08tuVaVkDFDbShAUs62yL6R/NrqyJFfh/0UyOkB3RL+NS
X1vKT1ONdRY=
Host: pixel-eu.rubiconproject.com

170.    The Rubicon Tracker also intercepts the detailed, full-string URL from each page of the Bon Appetit website a user visits, thereby intercepting the user's communications with the website regarding which articles they want to view.



171.    The Rubicon Tracker also collects the user's browser and device information in the manner described above.

```
"Chromium";v="132",
"Google Chrome";v="132"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
```

172.    The Rubicon Tracker also acts as an SSP on the Bon Appetit website, placing bids to target particular users with advertisements. During Plaintiffs' testing. Defendant placed a bid for a lilly.com ad for $3.30 per thousand impressions ("cpm") in an auction run by the Adsrvr Partner Pixel. To do this, Defendant needs to ID sync with several Partner Pixels on the Bon Appetit website to send and obtain information about the individual website user.

```
"campaign_id": 79987,
"rtb_rule_id": 2053160,
"cpm": 3.300000,
"adomain": ["lilly.com"]
```

173.    Defendant, then adds the collected information to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and information viewed—and enriches Bon Appetit—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

174.    Defendant also, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information

to its consumer profiles and tracking products, as well as connecting that information to users being

offered up for sale to advertisers as part of the real-time-bidding advertising process.

### D. Rocket Mortgage

175. Rocket Mortgage is a company that operates rocketmortgage.com, a website where

consumers can apply for and obtain home loans.

176. Unbeknownst to website visitors, the Rubicon Tracker is loaded onto the Rocket

Mortgage website.

177. As soon as the user reaches the Rocket Mortgage Website, the Rubicon Tracker loads

tracking cookies onto the individual's browser in the manner described herein.

Cookie: khaos=M477FU9H-X-BFUR;
audit=1|RM5S3etGyg7fcWcFlCl++0zv2XzBODWsWly1nPLD8tl7X+1h7+Gc67U2OU7IM7b1nxO3IBLiCHm
M1KxoLazIt8oW2SgbbjsrEOjxxX8e+bOuJtu6LVPVNQTdr5k5Wo54x1jCykaAwBd/6K+MJaMXAo76/Gy8e
wrDCOeqF/Dn4Co=

178. The Rubicon Tracker also collects the user's browser and device information in the

manner described above.

sec-ch-ua-platform: "Windows"
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko)
Chrome/131.0.0.0 Safari/537.36
sec-ch-ua: "Google Chrome";v="131", "Chromium";v="131", "Not_A Brand";v="24"

179. Also unbeknownst to website visitors the Adnxs and Adsrvr Partner Pixels are loaded

onto the Rocket Mortgage website.

https://match.adsrvr.org/track/cmf/rubicon?gdpr=0        match.adsrvr.org        GET
/track/cmf/rubicon?gdpr=0
Mon Dec 02 12:59:13 EST 2024

https://ib.adnxs.com/getuid?https%3a%2f%2fmatch.adsrvr.org%2ftrack%2fcmf%2fappnexus%3fttd%3d1
%26anid%3d%24UID&ttd_tdid=d02a11b1-20c8-4592-93b5-a32be2af8121

180.   The Adnxs Pixel collects the user's IP address and then engages in ID syncing with Adsrvr, sharing the information it has collected on an individual website user.

```
https://ib.adnxs.com/bounce?%2Fgetuid%3Fhttps%253a%252f%252fmatch.adsrvr.org%252ft
rack%252fcmf%252fappnexus%253fttd%253d1%2526anid%253d%2524UID%26ttd_tdid%3Dd02a11b
1-20c8-4592-93b5-a32be2af8121   ib.adnxs.com   GET
/bounce?%2Fgetuid%3Fhttps%253a%252f%252fmatch.adsrvr.org%252ftrack%252fcmf%252fapp
nexus%253fttd%253d1%2526anid%253d%2524UID%26ttd_tdid%3Dd02a11b1-20c8-4592-93b5-a32
be2af8121
```

181.   The Adsrvr Pixel engages in ID syncing with numerous pixels, including the Rubicon Tracker. The purpose of this is for all of the pixels to obtain all previous information collected on an individual user by the other Pixels.

```
https://pixel.rubiconproject.com/tap.php?v=9881&nid=2307&put=d02a11b1-20c8-4592-93
b5-a32be2af8121&gdpr=0&gdpr_consent=&expires=30&next=https%3A%2F%2Fmatch.adsrvr.or
g%2Ftrack%2Fcmf%2Frubicon   pixel.rubiconproject.com   GET
/tap.php?v=9881&nid=2307&put=d02a11b1-20c8-4592-93b5-a32be2af8121&gdpr=0&gdpr_cons
ent=&expires=30&next=https%3A%2F%2Fmatch.adsrvr.org%2Ftrack%2Fcmf%2Frubicon
```

182.   The Rubicon tracker shares the information it has collected on an individual user and collects information obtained by the Partner Pixels through this ID syncing process.

183.   Defendant then adds this information to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and information viewed—and enriches Rocket Mortgage—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

184.   Defendant also, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**E.    Zillow**

185.    Zillow's website, zillow.com, is an online resource for real estate renters and buyers nationwide.  Website visitors can view listings for specific properties, search for properties in specific geographic areas, and apply to rent or buy specific properties.

186.    Unbeknownst to Zillow Website visitors, the Rubicon Tracker is loaded onto each page the Zillow website.

https://pixel.rubiconproject.com/tap.php?v=6434&nid=2149&put=k--WNsgu3gl77bCl2J43kU-omP1y
HY63aTq3WXow&expires=30

187.    As soon as the individual reached the Zillow website, the Rubicon Tracker installs tracking cookies on the individual's browser as described herein.

Cookies:
khaos M477FU9H-X-BFUR
khaos_p        M477FU9H-X-BFUR

188.    The Rubicon Tracker also collects the individual's browser and device information as described above.

"client": {
        "browser": "Chrome"

189.    The Rubicon Tracker also intercepts the detailed, full-string URL from each page of the Zillow website a user visits, thereby intercepting the user's communications with the website regarding which properties in which geographic areas they want to view.



"referrerUri":
"https://www.zillow.com/homedetails/11726-Balboa-Blvd-Granada-Hills-CA-91344/20110219_zpid/",

1

2      190.    Defendant also participates in real-time bidding auctions for ad space on the Zillow

3    website. The images below shows Defendant, through the Rubicon Tracker, placing a bid for a

4    stockx.com ad.

```
"bidderOrder": ["ix", "appnexus", "rubicon", "triplelift", "pubmatic"],

"adUnits": [{
        "adUnitCode": "hdp_iab_slot_box_1",
        "transactionId": "29c060e6-e66a-49fa-bbc3-79d126703106",
        "mediaTypes": ["banner"],
        "dimensions": [{
                "width": 300,
                "height": 250
        }],
        "pbAdSlot": "/7449/zillow/property_details/buy_agent/b_right_p3",
        "pattern": "/7449/Zillow/Property_Details/Buy_Agent/b_right_p3",
        "gpid": "/7449/zillow/property_details/buy_agent/b_right_p3",


        "bidder": "rubicon",
        "bidId": "240ad42cd926bdd",
        "source": "client",
        "status": "success",
        "clientLatencyMillis": 916,
        "httpLatencyMillis": 806,
        "bidResponse": {
                "bidPriceUSD": 0.05,
                "mediaType": "banner",
                "dimensions": {
                        "width": 300,
                        "height": 250
                },
                "adomains": ["stockx.com"],
                "networkId": "2149"
```

191.    This bidding process necessarily means that Defendant is sharing and receiving

information about the individual website visitor to target the advertising effectively.

192.    Defendant then adds the collected information to its profile on the individual. This

profile is connected to the ID assigned to the individual and added to Defendant's data products

described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and information viewed—and enriches Zillow as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

193.    Defendant also, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

## IV.    DEFENDANT'S SERVICES DEANONYMIZE USERS AND ENRICH DEFENDANT AND THE WEBSITE OPERATORS THROUGH REAL-TIME BIDDING AND PROFILING INDIVIDUALS

### A.    Defendant Combines The Data From The Subject Websites With Other Data To Deanonymize Users

194.    As a result of Magnite technology being deployed on thousands or millions of websites, Defendant is collecting various forms of personal information and web activity records of nearly every American and sells that data to target advertising.

195.    The information collected, on its own, is enough to identify the individual internet user.  But this is only the first step in Defendant's practices of dragnet surveillance.

196.    Then Defendant enhances and "integrate[s the data] with a number of third party data, attribution and identity vendors, allowing buyers and sellers to leverage these solutions directly through [Magnite's] platform without the need for multiple vendor contracts."[88]  That is, a publisher using Magnite's services "can blend" their first-party data with other "third-party data, or scale them with lookalike modeling."[89]  Further, sellers can "activate [their] data across Magnite exchanges without the data sets ever being decrypted" to "add to, expand, and transform their audiences."[90]

---

[88] MAGNITE INC., FORM 10-K, *supra*, at 6.

[89] Talia Comorau, *Magnite DMP enables media owners to activate first-party audience and contextual data*, MAGNITE, (Aug. 15, 2023), https://www.magnite.com/blog/magnite-dmp-enables-media-owners-to-activate-first-party-audience-and-contextual-data/.

[90] Talia Comorau, *How Magnite Access maximizes the value of audience data assets for media owners and advertisers*, MAGNITE, (June 15, 2023), https://www.magnite.com/blog/how-magnite-access-maximizes-the-value-of-audience-data-assets-for-media-owners-and-advertisers/.

---

According to Magnite, "Magnite's media owner and advertiser relationships across an ever-growing omnichannel space – including streaming and display – provides a breadth of audience activation that is difficult to find" for sellers.[91]   Additionally, with Magnite's user ID syncing processes, Magnite not only has access to its own information that it tracks from Internet users, but also the information that its partner advertisers track.[92]  In this way, Magnite amasses and aggregates Internet users' data and sells it back to its partner advertisers.

197.    Magnite has a whole suite of identity products for this purpose, including "Magnite Match [which] allows for matching hashed emails to [their] identity graph, helping retailers onboard, match, and activate their data efficiently."[93]  *See also* Factual Allegations, § II.5, *supra*.  Magnite also enables companies to target specific people through their Custom Auction Packages.[94]

B.    **The Partner Pixels Use The Profiles Created By Defendant To Enhance Their Advertising And Analytics Services**

198.    In addition to contributing vast amounts of data to Magnite's data profiles, the data collected by Magnite is utilized by both Magnite and the Partner Pixels to conduct hyper-targeted advertising through the real-time bidding process.  *See* Factual Allegations, §§ I.B and II.2, *supra*.

199.    The Magnite identity resolution process is a key part of a complex ecosystem of pixels that deliver detailed user information to advertisers to increase the efficiency of those advertisements.

200.    Further, the delivery of advertisements facilitated by Magnite, involves the sharing of vast amounts of consumer information with Partner Pixels.

201.    When Magnite shares website visitor information with a Pixel Partner, that partner (i) uses the information provided by Magnite to add information to its own data and advertising datasets

---

[91] *Id.*

[92] *Magnite's CTV Supply Leadership is Unmatched with 99% Market Coverage, Shows Latest Jouce Report*, https://www.stocktitan.net/news/MGNI/magnite-s-ctv-supply-leadership-is-unmatched-with-99-market-coverage-wjnaa3l66hbz.html#:~:text=Magnite%20has%20direct%20relationships%20with,of%20its%20CTV%20supply%20partners.

[93] Alan Wolk, *Privacy, Data, and CTV: Magnite's Approach to Retail Media*, TVREV (Oct. 29. 2024), https://www.tvrev.com/news/privacy-data-and-ctv-magnites-approach-to-retail-media (interviewing Gretchen Bobroff, Head of Retail Media at Magnite).

[94] *Buyers*, MAGNITE, https://www.magnite.com/buyers/.

and (ii) shares the identity information with other advertisers during the real-time bidding delivery of advertisements.

202.    For ads to be delivered as soon as a website user visits a site, multiple technology companies need access to detailed information about the identity and interests of the individual website visitor.

203.    This information is provided by the Partner Pixels, who use Defendant's identity resolution services or advertising services (which they pay for) to create and expand their own datasets, which they in turn disclose to other players in the real-time bidding ecosystem as advertisements are delivered on websites.

204.    Each time a user is selected by this network of advertisers to receive an ad, the advertisers "bid" on the user—meaning Defendant or the Partner Pixels are paid for the information they have stored about that user.  Millions of these bids are made per day across the Internet, demonstrating the immense value of the data Defendant improperly collects on Plaintiffs and Class Members.

205.    As such, the improper collection of vast amounts of data on Plaintiffs and Class Members is done both for Defendant's profit and for the profit of the Partner Pixels.

## V.    PLAINTIFFS' EXPERIENCES

### A.  Plaintiff Lisa Tsering

206.    In or about March 2025, Plaintiff Lisa Tsering visited the Healthline website while in California and read various health-related articles.

207.    Unbeknownst to Plaintiff Tsering, the Rubicon Tracker was loaded onto each page of the website.  The Rubicon Tracker installed multiple tracking cookies onto Plaintiff Tsering's browser.  When Plaintiff Tsering visited the Healthline website, the Rubicon Pixel called the Partner Pixels on the website.

208.    The Rubicon Pixel and its Partner Pixels all collected information about Plaintiff Tsering's device, browser, and tracked her as she navigated through the website.

209.    Defendant provided Partner Pixels with identity resolution services so that those entities could deanonymize the data it collected on Plaintiff Tsering, bolster their own data profiles, and sell her information during the real-time-bidding process.

210.    Defendant also intercepted Plaintiff Tsering's article selections (her communications with the Healthline website) and audience information related to those selections.

211.    These interceptions happened in real time as Plaintiff Tsering navigated through the website.

212.    Defendant compiled this information into a profile on Plaintiff Tsering and added the bolstered profile to its suite of data products described above.

213.    Defendant also, by using the cookies loaded onto Plaintiff Tsering's browser, tracked her future web browsing activity across the internet and assisted other Partner Pixels in tracking her and wiretapping her communications with websites.

214.    Plaintiff Tsering was unaware that Defendant was installing trackers on her browser, aiding in the wiretapping of her communications, deanonymizing her personal data, or collecting, selling, and disclosing her personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor could Plaintiff Tsering have discovered these facts.

215.    Plaintiff Tsering did not provide her prior consent to Defendant to install trackers on her browser, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor did Defendant obtain a court order to do the same.

216.    Plaintiff Tsering has, therefore, had her privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Tsering.

**B.    Plaintiff Ariel Gilligan**

217.    In or about March 2025, Plaintiff Ariel Gilligan visited the Buzzfeed website while in California and selected various articles to read.

218.    Unbeknownst to Plaintiff Gilligan, the Rubicon Tracker and Partner Pixels were loaded onto each page of the website.

219.    When Plaintiff Gilligan visited the Buzzfeed website, The Rubicon Tracker installed tracking cookies onto Plaintiff Gilligan's browser.

220.    The Rubicon Tracker and its Partner Pixels all collected information about Plaintiff Gilligan's device, browser, and tracked her as she navigated through the website.

221.    Defendant provided the Partner Pixels with identity resolution services so that those entities could deanonymize the data it collected on Plaintiff Gilligan, bolster their own data profiles, and sell her information during the real-time-bidding process.

222.    Defendant also collected information about Plaintiff Gilligan, including the URLs of the webpages she visited.

223.    Defendant, by receiving the full-string URL of each page of the website, intercepted Plaintiff Gilligan's confidential communications with the website.

224.    These interceptions happened in real time as the information was entered into the website.

225.    Defendant compiled this information into a profile on Plaintiff Gilligan and added the bolstered profile to its suite of data products described above.

226.    Defendant also, by using the cookies loaded onto Plaintiff Gilligan's browser, tracked her future web browsing activity across the internet and assisted other Partner Pixels in tracking her and wiretapping her communications with websites.

227.    Plaintiff Gilligan was unaware that Defendant was installing trackers on her browser, aiding in the wiretapping of her communications, deanonymizing her personal data, or collecting, selling, and disclosing her personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor could Plaintiff Gilligan have discovered these facts.

228.    Plaintiff Gilligan did not provide her prior consent to Defendant to install trackers on her browser, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data, to advertising technology companies, other data brokers,

1    or any person or entity doing business with Defendant.  Nor did Defendant obtain a court order to do

2    the same.

3        229.    Plaintiff Gilligan has, therefore, had her privacy invaded by Defendant's violations

4    of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and

5    sale of the improperly collected data concerning Plaintiff Gilligan.

6        **C.    Plaintiff Logan Mitchell**

7        230.    In or about February 2025, Plaintiff Logan Mitchell visited the Bon Appetit website

8    while in California and selected and read various recipe articles.

9        231.    Unbeknownst to Plaintiff Mitchell, the Rubicon Tracker and Partner Pixels were

10    loaded onto each page of the website.

11        232.    When Plaintiff Mitchell visited the Bon Appetit website, the Rubicon Tracker

12    installed tracking cookies onto Plaintiff Mitchell's browser.

13        233.    The Rubicon Tracker and its Partner Pixels all collected information about Plaintiff

14    Mitchell's device, browser, and tracked her as she navigated through the website.

15        234.    Defendant provided the Partner Pixels with identity resolution services so that those

16    entities could deanonymize the data it collected on Plaintiff Mitchell, bolster their own data

17    profiles and sell her information during the real-time-bidding process.

18        235.    Defendant also collected information about Plaintiff Mitchell, including the URLs of

19    each webpage she visited.

20        236.    Defendant, by receiving the full-string URL of each page of the website, intercepted

21    Plaintiff Mitchell's confidential communications with the website.

22        237.    These interceptions happened in real time as the information was entered into the

23    website

24        238.    Defendant compiled this information into a profile on Plaintiff Mitchell and added

25    the bolstered profile to its suite of data products described above.

26        239.    Defendant also, by using the cookies loaded onto Plaintiff Mitchell's browser, tracked

27    her future web browsing activity across the internet and assisted other Partner Pixels in tracking her

28    and wiretapping her communications with websites.

240.    Plaintiff Mitchell was unaware that Defendant was installing trackers in her browser, aiding in the wiretapping of her communications, deanonymizing her personal data, or collecting, selling, and disclosing her personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor could Plaintiff Mitchell have discovered these facts.

241.    Plaintiff Mitchell did not provide her prior consent to Defendant to install trackers on her browser, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor did Defendant obtain a court order to do the same.

242.    Plaintiff Mitchell has, therefore, had her privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Mitchell.

**D.    Plaintiff Marc Russo**

243.    In or about December 2023, Plaintiff Marc Russo visited the Rocket Mortgage website while in California and applied for a mortgage.

244.    Unbeknownst to Plaintiff Russo, the Rubicon Tracker was loaded onto each page of the website.

245.    When Plaintiff Russo visited the Rocket Mortgage website, the Rubicon Tracker installed tracking cookies onto his browser.

246.    The Rubicon Tracker collected information about Plaintiff Russo's device, browser, and tracked him as he navigated through the website.

247.    Defendant provided Partner Pixels with identity resolution services so that Magnite could deanonymize the data it collected on Plaintiff Russo and sell it during the real-time-bidding process.

248.    Defendant also collected information about Plaintiff Russo, including the webpages he visited, his IP address, and fingerprint information about his device and browser, among others.

249.    Defendant compiled this information into a profile on Plaintiff Russo and added the bolstered profile to Magnite's suite of data products described above.

250.    Defendant also, by using the cookies loaded onto Plaintiff Russo's browser, tracked his future web browsing activity across the internet and assisted other Partner Pixels in tracking him and wiretapping his communications with websites.

251.    Plaintiff Russo was unaware that Defendant was installing trackers on his browser, aiding in the wiretapping of his communications, deanonymizing his personal data, or collecting, selling, and disclosing his personal data, including information about his mortgage, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor could Plaintiff Russo have discovered these facts.  Plaintiff Russo did not become aware that he was being tracked on the Rocket Mortgage website and across the internet by Defendant until November 2024.

252.    Plaintiff Russo did not provide his prior consent to Defendant to install trackers on his browser, aid in the wiretapping of his communications, deanonymize his personal data, or collect, sell, and disclose his personal data, including information about his mortgage, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendants obtain a court order to do the same.

253.    Plaintiff Russo has, therefore, had his privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Russo.

**E.      Plaintiff Dilara Uskup**

254.    In or about December 2024, Plaintiff Dilara Uskup visited the Zillow website while in California and searched for properties.

255.    Unbeknownst to Plaintiff Uskup, the Rubicon Tracker and the Partner Pixels were loaded onto each page of the website.

256.    When Plaintiff Uskup visited the Zillow website,  Each Rubicon pixel installed tracking cookies onto her browser.

257.    Both the Rubicon Pixel and the Partner Pixels collected information about Plaintiff Uskup's device, browser, and tracked her as she navigated through the website.

258.    Each Pixel, by receiving the full-string URL of each page of the website, intercepted Plaintiff Uskup's confidential communications with the Zillow website, including her geographic location and the specific properties that Plaintiff Uskup clicked on, viewed, and saved.

259.    These interceptions happened in real time as the information was entered into the website.

260.    Defendant provided the Rubicon Pixel and each Partner Pixel with identity resolution services so that each Partner Pixel could deanonymize the data it collected on Plaintiff Uskup and sell it during the real-time-bidding process.

261.    Defendant also collected information about Plaintiff Uskup, including the properties she viewed, her IP address, and fingerprint information about her device and browser, among others.

262.    Defendant compiled this information into a profile on Plaintiff Uskup and added the bolstered profile to its suite of data products described above.

263.    Defendant also, by using the cookies loaded onto Plaintiff Uskup's browser, tracked her future web browsing activity across the internet and assisted other Partner Pixels in tracking him and wiretapping her communications with websites.

264.    Plaintiff Uskup was unaware that Defendant was installing trackers on her browser, aiding in the wiretapping of her communications, deanonymizing her personal data, or collecting, selling, and disclosing her personal data, including data about her living situation, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor could Plaintiff Uskup have discovered these facts.  Plaintiff Uskup did not become aware that she was being tracked on the Zillow website and across the internet by Defendant until January 2025.

265.    Plaintiff Uskup did not provide her prior consent to Defendant to install trackers on her browser, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data, including data about her living situation, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendants obtain a court order to do the same.

266.    Plaintiff Uskup has, therefore, had her privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Uskup.

## **CLASS ALLEGATIONS**

267.    **Class Definition:** Plaintiffs seek to represent a class of similarly situated individuals defined as follows:

> All persons in the United States whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was used to create a profile and/or made available for sale or use through Defendant's platform, distributed or sold in the process of delivering advertising on websites, mobile applications, or other digital media, or otherwise.

268.    **California Subclass**: Plaintiffs also seek to represent a subclass of similarly situated individuals defined as follows:

> All California residents in the United States whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was used to create a profile and/or made available for sale or use through Defendant's platform, distributed or sold in the process of delivering advertising on websites, mobile applications, or other digital media, or otherwise.

269.    The Class and California Subclass shall be collectively referred to as the "Classes," and Members of the Class and Subclass will collectively be referred to as "Class Members," unless it is necessary to differentiate them.

270.    Excluded from the Classes are Defendant, any affiliate, parent, or subsidiary of any Defendant; any entity in which any Defendant has a controlling interest; any officer director, or employee of any Defendant; any successor or assign of any Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

271.    **Numerosity**.  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiffs currently; however, it is estimated that there are tens or hundreds of millions of individuals

in the Classes.  The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Defendant's customers and advertising partners.

272.    **Typicality**.  Plaintiffs' claims are typical of the claims of the Classes.  Plaintiffs, like all Class Members, had their information collected and made available for sale by Defendant using comprehensive user profiles compiled about Plaintiffs.

273.    **Adequacy**.  Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Classes.  Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the field of digital privacy litigation specifically.  Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

274.    **Commonality/Predominance**.  Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members because Defendant has acted on grounds generally applicable to the Classes.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Classes include:

(a)    Whether Defendant's acts and practices alleged herein constitute egregious breaches of social norms;

(b)    Whether Defendant acted intentionally in violating Plaintiffs' and Class Members' privacy rights under the California Constitution or common law;

(c)    Whether Defendant was unjustly enriched because of its violations of Plaintiffs' and Class Members' privacy rights; and

(d)    Whether Plaintiffs and Class Members are entitled to damages under CIPA or any other relevant statute;

275.    **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured

persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs know of no special difficulty to that would be encountered by litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I
### Intrusion Upon Seclusion

276.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

277.    Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

278.    Plaintiffs bring this claim pursuant to California law.

279.    To state a claim for intrusion upon seclusion "[Plaintiffs] must possess a legally protected privacy interest … [Plaintiffs'] expectations of privacy must be reasonable … [and Plaintiffs] must show that the intrusion is so serious in 'nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms." *Hernandez v. Hillsides, Inc*. 47 Cal. 4th 272, 286-87 (2009).

280.    Plaintiffs and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive, confidential communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

281.    By conducting such widespread surveillance, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

282.    Plaintiffs and Class Members had a reasonable expectation that their communications, identities, personal activities, and other data would remain confidential.

283.    Plaintiffs and Class Members did not and could not authorize Defendant to intercept data on every aspect of their lives and activities.

284. The conduct described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

(a) Defendant engages in widespread data collection and interception of Plaintiffs' and Class Members' internet and app activity, including their communications with websites and apps, thereby learning intimate details of their daily lives based on the massive amount of information collected about them.

(b) Defendant combines the information collected on websites and apps with offline information also gathered on individuals to create the profiles used in the Magnite products described herein.

(c) Defendant creates comprehensive profiles based on this online and offline data, which violates Plaintiffs' Class Members' common law right to privacy and the control of their personal information.

(d) Defendant sells or discloses these profiles, which contain the improperly collected data about Plaintiffs and Class Members, to an unknown number of advertisers for use in the real-time-bidding process, which likewise violates Plaintiffs' and Class Members' common law right to privacy and the control of their personal information.

285. Defendant's amassment of electronic information reflecting all aspects of Plaintiffs' and Class Members' lives into profiles for future or present use is in and of itself a violation of their right to privacy considering the serious risk these profiles pose to their autonomy.

286. In addition, those profiles are and can be used to further invade Plaintiffs' and Class Members' privacy by, for example, allowing third parties to learn intimate details of their lives and target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers and other data brokers without their consent.

287. Accordingly, Plaintiffs and Class and California Subclass Members seek all relief available for invasion of privacy claims under common law.

## COUNT II
### Violation Of The California Invasion of Privacy Act
### Cal. Penal Code § 631(a)

288. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

289.    Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

290.    The California Legislature enacted the CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

291.    The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*."  *Ribas*, 38 Cal. 3d at 363 (emphasis added, internal quotations omitted).  This restriction is based on the "substantial distinction … between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor*, whether that auditor be a person or mechanical device."  *Id*. at 361 (emphasis added).  Such "simultaneous dissemination" "denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements."  *Id*.; *see also Reporters Committee for Freedom of Press*, 489 U.S. at 763 ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

292.    Further, "[t]hough written in terms of wiretapping, Section 631(a) applies to Internet communications."  *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022).  Indeed, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme."  *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013).  This accords with the fact that "the California Supreme Court has [] emphasized that all CIPA provisions are to be interpreted in light of the broad privacy-protecting statutory purposes of CIPA."  *Javier*, 2022 WL 1744107, at *2.  "Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection."  *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

293.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

294.    To avoid liability under CIPA § 631(a), a defendant must show it had the consent of *all* parties to a communication, and that such consent was procured *prior to* the interception occurring.  *See Javier*, 2022 WL 1744107, at *2.

295.    Defendant's Rubicon Tracker, various pixels and SDKs are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

296.    Defendant is a "separate legal entity that offers [a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, Defendant has the capability to use the wiretapped information for a purpose other than simply recording the communications and providing the communications to website operators.  Accordingly, Defendant was a third party to any communication between Plaintiffs and California

Subclass Members, on the one hand, and any of the websites at issue, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

297.    At all relevant times, Defendant willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents of the electronic communications of Plaintiffs and California Subclass Members, on the one hand, and the websites at issue, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

298.    At all relevant times, Defendant uses those intercepted communications, including but not limited to building comprehensive user profiles that are offered for disclosure or sale in real-time bidding to prospective advertisers.

299.    Further, Defendant "[a]ids, agrees with, employs, or conspires with" each Partner Pixel that it provides identity resolution to and who intercepts Plaintiffs' and California subclass Members' confidential communications.

300.    Plaintiffs and California Subclass Members did not provide their prior consent to Defendant's intentional interception, reading, learning, recording, collection, and usage of Plaintiffs' and California Subclass Members' electronic communications.

301.    The wiretapping of Plaintiffs and California Subclass Members occurred in California, where Plaintiffs and California Subclass Members accessed the websites, where Defendant's pixels were loaded on Plaintiffs' and California Subclass Members' browsers, and where Defendant routed Plaintiffs' and California Subclass Members' electronic communications to Defendant's servers.

302.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and California Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT III
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 638.51(a)

303.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

304.    Plaintiffs bring this claim individually and on behalf of the proposed California Subclass against Defendant.

305.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

306.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

307.    A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

308.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

309.    For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address the email was sent to, and the subject line—because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

310.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology has advanced,

however, courts have expanded the application of these surveillance devices.  This, combined with the California Supreme Court's mandate to read provisions of the CIPA broadly to protect privacy rights, has led courts to apply CIPA § 638.50 to internet tracking technologies similar to Defendant's technologies at issue here.  *See*, *e.g.*, *Shah v. Fandom, Inc.*, No. 24-CV-01062-RFL, 2024 WL 4539577, at *21   (N.D. Cal. Oct. 21, 2024) (finding trackers were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley*, 684 F. Supp. 3d at 1050 (referencing CIPA's "expansive language" when finding software provided by data broker was a "pen register").

311.    The Rubicon Tracker that Magnite installed on Plaintiffs' and California Subclass Members' browsers, to the extent they do not intercept "contents" of communications as defined in CIPA § 631(a), are "pen registers" because they are "device[s] or process[es]" that "capture" the "routing, addressing, or signaling information"—the IP address, geolocation, device information, and other persistent identifiers—from the electronic communications transmitted by Plaintiffs' and California Subclass Members' computers or smartphones.  Cal. Penal Code § 638.50(b); *see also Shah,* 2024 WL 4539577, at *3; *Mirmalek*, 2024 WL 4102709, at *3.

312.    At all relevant times, Defendant installed the Rubicon Trackers—which are pen registers—on Plaintiffs' and California Subclass Members' browsers, which enabled Defendant to collect Plaintiffs' and California Subclass Members' IP addresses, geolocation, device information, and other persistent identifiers from the websites they visited.  Defendant then used the Trackers to build comprehensive user profiles, which were used to unjustly enrich Defendant and its clients by linking and enhancing Plaintiffs' and California Subclass Members' data when it is provided to advertisers through the real-time bidding process.

313.    Plaintiffs and California Subclass Members did not provide their prior consent to Defendant's installation or use of the Rubicon Tracker or its pixels or any other tracking technology at issue.

314.    Defendant did not obtain a court order to install or use the Rubicon Tracker, pixels or other tracking technology at issue.

315.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and California Subclass Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

<u>**COUNT IV**</u>
**Unjust Enrichment**

316.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

317.    Plaintiffs bring this claim individually and on behalf of the Class against Defendant and on behalf of the California Subclass against Defendant.

318.    In both cases, Plaintiffs bring this claim pursuant to California law.

319.    Defendant has wrongfully and unlawfully trafficked in the named Plaintiffs' and Class Members' personal information and other personal data without their consent for substantial profits.

320.    Plaintiffs' and Class Members' personal information and data have conferred an economic benefit on Defendant, which was collected and used by Defendant without consent.

321.    Defendant has been unjustly enriched at the expense of Plaintiffs and Class Members and has unjustly retained the benefits of its unlawful and wrongful conduct.

322.    It would be inequitable and unjust for Defendant to be permitted to retain any of the unlawful proceeds resulting from its unlawful and wrongful conduct.

323.    Plaintiffs and Class Members accordingly are entitled to equitable relief including restitution and disgorgement of all revenues, earnings, and profits that Defendant obtained because of its unlawful and wrongful conduct.

324.    When a defendant is unjustly enriched at the expense of a plaintiff, the plaintiff may recover the amount of the defendant's unjust enrichment even if plaintiff suffered no corresponding loss, and plaintiff is entitled to recovery upon a showing of merely a violation of legally protected rights that enriched a defendant.

325.    Defendant has been unjustly enriched by virtue of its violations of Plaintiffs' and California Class members' legally protected rights to privacy as alleged herein, entitling Plaintiffs and California Class members to restitution of Defendant's enrichment. "[T]he consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss." RESTATEMENT (THIRD) OF RESTITUTION § 1, cmt. a.

326.    Defendant was aware of the benefit conferred by Plaintiffs. Indeed, Defendant's data-brokerage products are premised entirely on the sale of such data to third parties. Defendant therefore acted in conscious disregard of the rights of Plaintiffs and Class and California Subclass Members and should be required to disgorge all profit obtained therefrom to deter Defendant and others from committing the same unlawful actions again.

## COUNT V
### Violation of the Electronic Communications Privacy Act
### 18 U.S.C. § 2511(1), *et seq*

327.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

328.    Plaintiffs bring this claim individually and on behalf of the Class against Defendant and on behalf of the California Subclass against Defendant.

329.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

330.    The ECPA protects both the sending and the receipt of communications.

331.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

332.    The transmission of Plaintiffs' website page visits, selections, purchases and persistent identifiers to each website each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

333.    The transmission of this information between Plaintiffs and Class members and each website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

334.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

335.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

336.    The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

337.    The following instruments constitute "devices" within the meaning of the ECPA:

    (a)    The Rubicon Tracker, and any other tracking code or SDK used by Defendant;

    (b)    Plaintiffs' and Class Members' browsers;

    (c)    Plaintiffs' and Class Members' mobile devices;

    (d)    Defendant and each website's web and ad servers;

    (e)    Each Partner Pixel;

    (f)    The plan Defendant carried out to effectuate the tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser to navigate the Website.

338.    Plaintiffs and Class Members' interactions with each website are electronic communications under the ECPA.

339.    By utilizing the Rubicon Tracker, as described herein, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class members in violation of 18 U.S.C. § 2511(1)(a).

340.    Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiffs and Class members regarding their food and restaurant preferences, cookware shopping habits, consumption of media, geolocation, and many more. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

341.    By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

342.    Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

343.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, "[t]he association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v.LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

344.    Defendant was not acting under the color of law to intercept Plaintiffs' and Class members' wire or electronic communications.

345.    Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy. Plaintiffs and Class members had a reasonable expectation that Defendant would not intercept their communications and sell their data to dozens of parties without their knowledge or consent.

346.    The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

347.    As a result of each and every violation thereof, on behalf of themselves and the Class, Plaintiffs seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, et seq. under 18 U.S.C. § 2520.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all Class Members, seek judgment against Defendant, as follows:

(a)    For an order certifying the Classes pursuant to Fed. R. Civ. P. 23, naming Plaintiffs as the representative of the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes.

(b)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(c)    For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(d)    For pre- and post-judgment interest on all amounts awarded; and

(e)    For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated:  April 9, 2025                    Respectfully submitted,


**BURSOR & FISHER, P.A**.

By: */s/ Philip L. Fraietta*
             Philip L. Fraietta

Philip L. Fraietta
1990 North California Blvd., Suite 940

Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: email@bursor.com
        email2@bursor.com

*Attorneys for Plaintiffs*